**FOR PUBLICATION**

### IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
### DIVISION OF ST. THOMAS & ST. JOHN

ROBERT ADDIE, JORGE PEREZ and )
JASON TAYLOR, )
                     )
         Plaintiffs, )
                     )       Civil No. 2004-135
      v. )
                     )
CHRISTIAN KJAER, HELLE )
BUNDGAARD, STEEN BUNDGAARD, )
JOHN KNUD FÜRST, KIM FÜRST, )
NINA FÜRST, and KEVIN F. )
D'AMOUR, )
                     )
         Defendants. )
_____ )

ATTORNEYS:

**Gregory H. Hodges, Esq.**
St. Thomas, U.S.V.I.
       *For the plaintiffs.*

**Carol G. Hurst, Esq.**
St. Thomas, U.S.V.I.
       *For defendants Christian Kjaer, Helle Bundgaard, Steen*
       *Bundgaard, John Knud Fürst, Kim Fürst, and Nina Fürst.*

**Maria T. Hodge, Esq.**
St. Thomas, U.S.V.I.
       *For defendant Kevin F. D'Amour.*

<u>**MEMORANDUM OPINION**</u>

**GÓMEZ, C.J.**

Before the Court is the motion of the plaintiffs, Robert
Addie ("Addie"), Jorge Perez ("Perez") and Jason Taylor
("Taylor") (together, the "Buyers"), for summary judgment on
Count VI of their complaint, which asserts a conversion claim
against the defendants, Christian Kjaer; Helle Bundegaard; Steen

*Addie, et al. v. Kjaer, et al.*
Civil No. 2004-135
Memorandum Opinion
Page 2

Bundegaard; John Knud Furst; Kim Furst; Nina Furst (together, the "Sellers"); and Kevin D'Amour ("D'Amour").  The Sellers have also filed a motion for summary judgment on the Buyers' conversion claim.

## I. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

Because the parties are familiar with the factual and procedural history of this matter, the Court recites only those facts necessary for the disposition of this motion.

The Buyers agreed to purchase two parcels of land from the Sellers: Great St. James Island, St. Thomas, U.S. Virgin Islands and Parcel No. 11 Estate Nazareth, No. 1 Red Hook Quarter, St. Thomas, U.S. Virgin Islands.  The Buyers also agreed (the "Escrow Agreement") to pay $1.5 million (the "Escrow Money") into an escrow account managed by Premier Title Company, Inc., formerly known as First American Title Company, Inc. ("Premier").[1]  At all times relevant, D'Amour was Premier's president and sole shareholder.  D'Amour also acted as counsel to the Sellers.

Neither parcel of land was conveyed as the parties contemplated.  The Buyers demanded the return of the Escrow Money.  The Escrow Money was not returned.  This action ensued.

The Buyers allege the following: breach of contract; negligent misrepresentation by the Sellers; fraud by certain

---

[1]  The Buyers and Premier reached a settlement.  As a consequence, Premier has been dismissed from this matter.

*Addie, et al. v. Kjaer, et al.*
Civil No. 2004-135
Memorandum Opinion
Page 3

defendants; fraud by D'Amour; conversion; breach of fiduciary
duty by Premier; and unjust enrichment.  The Buyers also seek a
declaration that: they are entitled to terminate the land
contracts; the Sellers cannot deliver marketable title to the
land; and the Sellers have defaulted under the terms of the land
contracts.

The Buyers seek summary judgment on the conversion claim
asserted in Count VI of the complaint.  The Sellers and D'Amour
have filed oppositions to the motion under separate cover.  The
Sellers also individually move for summary judgment on Count VI.
The Buyers have filed an omnibus reply to the defendants' various
oppositions.

## II. <u>DISCUSSION</u>

Summary judgment is appropriate if "the pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and
that the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c); *see also Hersh v. Allen Products Co.*, 789
F.2d 230, 232 (3d Cir. 1986).

The movant has the initial burden of showing there is no
genuine issue of material fact, but once this burden is met it
shifts to the non-moving party to establish specific facts
showing there is a genuine issue for trial. *Gans v. Mundy*, 762
F.2d 338, 342 (3d Cir. 1985).  The non-moving party "may not rest

*Addie, et al. v. Kjaer, et al.*
Civil No. 2004-135
Memorandum Opinion
Page 4

upon mere allegations, general denials, or . . . vague statements
. . . ." *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir.
1991).  "[T]here is no issue for trial unless there is sufficient
evidence favoring the non-moving party for a jury to return a
verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242, 249 (1986).

"[A]t the summary judgment stage the judge's function is not
himself to weigh the evidence and determine the truth of the
matter but to determine whether there is a genuine issue for
trial." *Id.*  In making this determination, this Court draws all
reasonable inferences in favor of the non-moving party. *See Bd.
of Educ. v. Earls*, 536 U.S. 822, 850 (2002); *see also Armbruster
v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994).

### III. <u>ANALYSIS</u>

Count VI asserts a conversion claim against the Sellers and
D'Amour.[2]  Specifically, that count alleges that D'Amour, through
Premier, released the Escrow Money to the Sellers in violation of
the terms of the Escrow Agreement.  Count VI further alleges that
the Sellers and D'Amour have converted the Escrow Money to their
own use and benefit and, despite demand, have refused to return
it.

_____

[2]  Other counts in the complaint are asserted against only
certain defendants.

*Addie, et al. v. Kjaer, et al.*
Civil No. 2004-135
Memorandum Opinion
Page 5

The Sellers argue that the Buyers' conversion claim should be dismissed because that claim is predicated on a breach of contract. The Court will address that argument first.[3]

"[T]he 'gist of the action' doctrine bars plaintiffs from bringing a tort claim that merely replicates a claim for breach of an underlying contract." *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 680 (3d Cir. 2002) (citation omitted; applying Pennsylvania law).[4] The doctrine is rooted in the principle that the "important difference between contract and tort actions is that

---

[3] The Buyers argue that whether their conversion claim actually sounds in contract is a question for the finder of fact and cannot be decided at this stage of the proceedings. The Buyers seek support for that argument in *Charleswell v. Chase Manhattan Bank, N.A.*, 308 F. Supp. 2d 545 (D.V.I. 2004). In that case, this Court explained that "[e]ven when the facts asserted in support of tort and contract claims are similar, courts in this district have been reluctant to dismiss claims on this basis without a factually intensive inquiry." *Id.* at 567. The Buyers' reliance on *Charleswell* is misplaced. In *Charleswell,* the Court was addressing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). The Buyers are correct that fact-intensive examinations are inappropriate when such a motion is under consideration. This matter, in contrast, is before the Court on a motion for summary judgment under Rule 56. The summary judgment stage is precisely the right time to address the applicability of the gist of the action doctrine. *See, e.g., Krajewski v. Am. Honda Fin. Corp.*, 557 F. Supp. 2d 596, 608 (E.D. 2008) (dismissing a conversion claim under the gist of the action doctrine on a motion for summary judgment).

[4] Neither the Supreme Court of the Virgin Islands nor the Superior Court of the Virgin Islands has expressly adopted the gist of the action doctrine. However, this Court has previously predicted that, given its favorable treatment by the Court of Appeals for the Third Circuit, Virgin Islands courts would adopt the doctrine. *See Charleswell*, 308 F. Supp. 2d at 566-67.

*Addie, et al. v. Kjaer, et al.*
Civil No. 2004-135
Memorandum Opinion
Page 6

the latter lie from the breach of duties imposed as a matter of

social policy while the former lie for the breach of duties

imposed by mutual consensus." *Bohler-Uddeholm Am., Inc. v.*

*Ellwood Group, Inc.*, 247 F.3d 79, 103-04 (3d Cir. 2001) (citation

omitted; applying Pennsylvania law).  The gist of the action

doctrine bars tort claims:

> (1) arising solely from a contract between the parties;
> (2) where the duties allegedly breached were created
> and grounded in the contract itself; (3) where
> liability stems from a contract; or (4) where the tort
> claim essentially duplicates a breach of contact claim
> or the success of which is wholly dependent on the
> terms of a contract.

*eToll, Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10, 19 (Pa.

Super. Ct. 2002) (internal citations omitted; applying

Pennsylvania law).  The "doctrine cannot be captured by any

precisely worded test [but rather] call[s] for a fact-intensive

judgment as to the true nature of a claim." *Williams v. Hilton*

*Group PLC*, 93 Fed. Appx. 384, 386 (3d Cir. 2004) (unpublished).

Several courts have applied the gist of the action doctrine

to bar conversion claims that mirror breach of contract claims.

For instance, in *Pittsburgh Construction Co. v. Griffith*, 834

A.2d 572 (Pa. Super. Ct. 2003), two homeowners contracted with a

construction company for the construction of a home.  To pay for

the project, the homeowners borrowed money, which was placed in

an escrow account with their bank, to be disbursed to the

construction company in scheduled increments.  After a dispute

*Addie, et al. v. Kjaer, et al.*
Civil No. 2004-135
Memorandum Opinion
Page 7

arose, the homeowners instructed their bank to withhold the final

two payments.  Thereafter, the construction company sued the

homeowners, alleging breach of contract and conversion.  A jury

awarded the construction company damages on both claims.  On

appeal, the Superior Court of Pennsylvania reasoned that the

construction company's "tort and breach of contract claims are

inextricably intertwined, the success of the conversion claim

depending entirely on the obligations as defined by the

contract." *Id.* at 584.  The court explained that

> in this instance we will not permit [the construction
> company] to interject a claim for tortious conversion
> into an action that is decidedly contractual.  The
> contractual remedies available to [the construction
> company] are sufficient to compensate it for the losses
> it suffered from the [homeowners'] refusal to
> release the scheduled draw payments.  Our decision is
> consistent with this Court's application of the "gist
> of the action" doctrine, as well as the more general
> policy disfavoring tort recovery based on a contractual
> breach.

*Id.*  Based on that reasoning, the court reversed the conversion

judgment.

Similarly, in *U.S. Claims, Inc. v. Saffren & Weinberg, LLP.*,

2007 U.S. Dist. LEXIS 88022 (E.D. Pa. Nov. 29, 2007), the

plaintiff corporation contracted with individuals to buy an

interest in the proceeds of their anticipated personal injury

claims.  The defendants were attorneys that represented many such

individuals during the execution of those contracts.  The

corporation sued the attorneys, alleging that the attorneys had

*Addie, et al. v. Kjaer, et al.*
Civil No. 2004-135
Memorandum Opinion
Page 8

failed to pay the corporation what it was owed under the

contracts.  The corporation asserted several theories of

liability, including breach of contract and conversion.  Ruling

on a subsequent motion to dismiss, the district court reasoned

that "the breach of contract and the conversion claims are

inextricably intertwined." *Id.* at *31.  The court noted that each

of the contracts created a duty in the attorneys to disburse to

the corporation any proceeds from any litigation verdict or

settlement.  The corporation's breach of contract claim alleged

that the attorneys had failed to fulfill that duty.  The court

further noted that the conversion claim alleged that the

attorneys converted the same amount of money as alleged in the

breach of contract claim.  Thus, the court concluded that the

> conversion claim is based on a duty that arose solely
> out of the parties' written contract, meaning that the
> contract is central to the conversion claim.  Absent
> the various contracts to which the parties mutually
> assented, Defendants were under no obligation to
> perform, or not perform, any of the actions that form
> the basis of Plaintiff's conversion claims.

*Id.*  Accordingly, the court dismissed the corporation's

conversion claim.

Here, the material facts relevant to resolution of the

Buyers' motion are undisputed.  The Buyers and the Sellers

undisputedly entered into contracts for the sale of two parcels

of land.  It is also undisputed that, as part of their agreement,

the parties entered into an escrow agreement.  The parties'

Addie, et al. v. Kjaer, et al.
Civil No. 2004-135
Memorandum Opinion
Page 9

various agreements imposed duties on the Sellers and Premier
regarding the management of the Escrow Money.  The damages the
Buyers seek in both their breach of contract claim and their
conversion claim are identical: $1.5 million.  Any entitlement
the Buyers have to that money is governed by their agreements
with the Sellers and Premier.  Because Count VI is really a
breach of contract claim masquerading as a tort claim, the gist
of the action doctrine prohibits the Buyers from seeking the
return of the Escrow Money on a conversion theory. *See*, *e.g.*,
*Jodek Charitable Trust, R.A. v. Vertical Net Inc.*, 412 F. Supp.
2d 469, 480 (E.D. Pa. 2006) (dismissing a tort claim under the
gist of the action doctrine because, "[a]bsent the various
contracts to which the parties mutually assented, Defendants were
under no obligation to perform, or not to perform, any of the
actions that form the basis of Plaintiff's tort claims"); *Freedom
Med., Inc. v. Royal Bank of Canada*, Civ. No. 04-5626, 2005 U.S.
Dist. LEXIS 37836, at *28 (E.D. Pa. Jan. 3, 2006) ("Whether
Plaintiff erred in making the payment or whether Defendant
improperly demanded the money must be decided as part of a breach
of contract claim and not a conversion claim."); *Neyer, Tiseo &
Hindo, Ltd. v. Russell*, Civ. No. 92-2983, 1993 U.S. Dist. LEXIS
2738, at *13-14 (E.D. Pa. Mar. 2, 1993) (dismissing a conversion
claim where the plaintiffs' entitlement to certain funds was
premised exclusively on its agreement with the defendants);

*Addie, et al. v. Kjaer, et al.*
Civil No. 2004-135
Memorandum Opinion
Page 10

*Cheatle v. Katz*, Civ. No. 02-4405, 2003 U.S. Dist. LEXIS 6625, at

*21-22 (E.D. Pa. Apr. 3, 2003) (same).[5]

Accordingly, the Court will deny the Buyers' motion for

summary judgment on Count VI.  The Court will grant the Sellers'

motion for summary judgment on that count.

D'Amour is a party to neither the Land Contracts nor the

Escrow Agreement.[6]  As a consequence, he cannot avail himself of

---

[5]  The Buyers contend that a plaintiff is permitted to
maintain an action in tort even where the parties are
contractually bound.  To buttress that contention, the Buyers
rely on *Key Corporate Capital, Inc. v. Tilley*, 216 Fed. Appx. 193
(3d Cir. 2007) (not precedential).  In that case, the Third
Circuit concluded that the plaintiff could assert a tort claim
against the defendant notwithstanding the parties' settlement
agreement, reasoning that the defendant's duty to pay the
plaintiff did not arise from obligations created by the
settlement agreement.  The court reasoned that conversion
therefore constituted the gist of the action and that the
settlement agreement was "merely collateral[.]" *Id.* at 195.  *Key
Corporate* is wholly distinguishable from this matter.  This Court
has already found that any duty on the part of the Sellers and
Premier to return the Escrow Money to the Buyers springs
exclusively from the parties' various agreements.  As a
consequence, *Key Corporate* is of no help to the Buyers.

The Buyers also unavailingly rely on *Levert v. Phila. Int'l
Records*, Civ. No. 04-1489, 2005 U.S. Dist. LEXIS 20309 (E.D. Pa.
Sept. 14, 2005), for the proposition that "if the duties breached
were of a type imposed on members of society as a matter of
social policy, the claim is deemed essentially based in tort."
*Id.* at *9.  The *Levert* Court rejected the application of the gist
of the action doctrine because the defendant seeking to invoke it
was not a party to any contract with the plaintiff.  Here, in
contrast, it is undisputed that the Buyers have entered into
valid contracts with the Sellers.

[6]  D'Amour signed both agreements, but only in his capacity
as attorney-in-fact for the Sellers.

*Addie, et al. v. Kjaer, et al.*
Civil No. 2004-135
Memorandum Opinion
Page 11

the gist of the action doctrine.[7] *See*, *e.g.*, *CentiMark Corp. v. Pegnato & Pegnato Roof Mgmt.*, Civ. No. 05-708, 2008 U.S. Dist. LEXIS 37057, at *38 (W.D. Pa. May 6, 2008) (holding that two of the defendants "cannot invoke the gist of the action doctrine to foreclose litigation of the conversion claim against them individually because they, as individuals, were not parties to the contract with" the plaintiff); *Levert*, 2005 U.S. Dist. LEXIS 20309, at *9-10 (concluding that a defendant's gist of the action defense was precluded because he "was not a party to any

---

[7] Nor can D'Amour escape tort liability, as he suggests in passing, simply because he was acting as an agent of a contracting party. *See Qualy v. Paine, Webber, Jackson & Curtis, Inc.*, 464 So. 2d 930, 935 (La. Ct. App.), *aff'd in part, rev'd in part on other grounds*, 475 So. 2d 756 (La. 1985) ("[O]ne who acts with another in keeping property from its rightful owner is guilty of conversion, and the fact that he acted as agent is no excuse."). Although never before recognized in the Virgin Islands, courts in Pennsylvania and other jurisdictions recognize a "participation theory." That theory "imposes personal liability on corporate officers or shareholders where they have personally taken part in the actions of the corporation." *Wicks v. Milzco Builders, Inc.*, 503 Pa. 614, 470 A.2d 86, 90 (Pa. 1983); *see also United States v. Hibernia Nat'l Bank*, 882 F.2d 961, 964 (5th Cir. 1989) ("[A] corporate officer may be personally liable for conversion committed on behalf of the corporation.") (applying Louisiana law; citation omitted). "Liability under this theory only attaches if the defendants participate in the wrongful act." *Alpart v. General Land Ptnrs, Inc.*, Civ. No. 07-4457, 2008 U.S. Dist. LEXIS 63182, at *18 (E.D. Pa. Aug. 19 2008). The Third Circuit has recognized the participation theory. *See Key Corporate Capital*, 216 Fed. Appx. at 195. Here, there is no dispute that D'Amour was Premier's president and sole shareholder at all times relevant and personally released the Escrow Money to the Sellers. As a consequence, D'Amour may be personally subject to conversion liability.

*Addie, et al. v. Kjaer, et al.*
Civil No. 2004-135
Memorandum Opinion
Page 12

contract"); *Fleet Nat'l Bank v. Boyle*, Civ. No. 04-1277, 2005
U.S. Dist. LEXIS 44036, at *43 (E.D. Pa. Sept. 12, 2005) (noting
that the defendants "cite no authority for the proposition that
they, as nonparties to the contract, are subject to the gist of
the action doctrine").

Under Virgin Islands law, "[c]onversion is an intentional
exercise of dominion or control over a chattel which so seriously
interferes with the right of another to control it that the actor
may justly be required to pay the other the full value of the
chattel." Restatement (Second) of Torts § 222A (1965).[8]  Money is
a chattel that may be the object of a conversion. *Chase Manhattan
Bank, N.A. v. Power Prods.*, 27 V.I. 126, 129 (Terr. Ct. 1992)
(citations omitted); *see also Willingham v. United Ins. Co.*, 628
So. 2d 328, 333 (Ala. 1993) ("[W]hen funds are segregated into a
separate account, *such as an escrow account*, those funds may be
the subject of a conversion.") (emphasis supplied).

There are several theories of conversion. *See Baram v.
Farugia*, 606 F.2d 42, 43-44 (3d Cir. 1979) (listing the various
ways of committing a conversion) (footnote omitted); *see also*

---

[8]  Under Virgin Islands law,

[t]he rules of the common law, as expressed in the
restatements of the law . . . shall be the rules of
decision in the courts of the Virgin Islands . . . in
the absence of local laws to the contrary.

V.I. Code Ann. tit. 1, § 4.

*Addie, et al. v. Kjaer, et al.*
Civil No. 2004-135
Memorandum Opinion
Page 13

Restatement (Second) of Torts § 223 (1965) (same).  Under the Restatement, one who acts as a bailee, agent, or servant may be subject to conversion liability if he makes an unauthorized delivery of property, unless he delivers the property to someone entitled to its immediate possession. *See Id.* § 234.

D'Amour, as the president of the escrow agent in the underlying transaction, in essence acted as a bailee.  The Buyers claim that D'Amour misdelivered the Escrow Money.  To prevail on such a conversion theory, the Buyers must show that (1) they had an ownership interest in and were entitled to immediate possession of the Escrow Money; and (2) D'Amour, unlawfully or without authorization, misdelivered the Escrow Money to the exclusion of, or inconsistent with, the Buyers' rights as owners.[9]  The question whether the Buyers have met their initial burden of showing that the elements of their conversion claim are satisfied turns, in part, on the duties of an escrow agent and an interpretation of the Escrow Agreement.

An escrow account is "[a] bank account, generally held in the name of the depositor and an escrow agent, that is returnable to the depositor or paid to a third person on the fulfillment of specified conditions." Black's Law Dictionary (8th ed. 2004).

---

[9]  Conversion generally also requires that the plaintiff demand the return of the property and that the defendant refuse to return it.  Here, the parties do not dispute that, despite the Buyers' demand, the Escrow Money has not been returned.

*Addie, et al. v. Kjaer, et al.*
Civil No. 2004-135
Memorandum Opinion
Page 14

Escrow is "property delivered by a promisor to a third party to be held by the third party for a given amount of time or until the occurrence of a condition, at which time the third party is to hand over the . . . property to the promisee." *Id.* Until the occurrence of such a condition, legal title to the property remains in the depositor. *In re Mushroom Transp. Co.*, 382 F.3d 325, 338 n.9 (3d Cir. 2004) (citation omitted; applying Pennsylvania law).

"[E]scrow agents owe their depositors a fiduciary duty to disburse the deposits according to the terms of the escrow agreement." *Trw Title Ins. Co. v. Sec. Union Title Ins. Co.*, 153 F.3d 822, 829 (7th Cir. 1998) (citation omitted); *see also John Deere Co. v. Walker*, 764 F. Supp. 147, 152 (D. Ariz. 1991) ("[T]he duties of the escrow agent are defined by the written instructions given to the escrow agent.") (citations omitted). Thus, "an escrow agent may be guilty of conversion if it violates the escrow agreement, exercises ownership without authorization, or acts in some other way that is inconsistent with its express duties under the contract." *Eckholt v. American Business Info.*, 873 F. Supp. 521, 523 (D. Kan. 1994) (applying Kansas law; citation omitted); *see also* 28 Am. Jur. 2d Escrow § 30 ("Since the depositary is bound by the terms of the deposit and charged with the duties voluntarily assumed by him or her, liability attaches to him or her for failing to follow his or her

*Addie, et al. v. Kjaer, et al.*
Civil No. 2004-135
Memorandum Opinion
Page 15

instructions, whether done deliberately or negligently.")
(footnotes omitted).

The parties do not dispute that the Escrow Agreement is a
valid, binding contract.  As such, its interpretation is governed
by general contract principles. *See*, *e.g.*, *Ferguson v. Hannover
Ruckversicherungs-Akteiengesellschaft*, Civ. No. 04-9254, 2007
U.S. Dist. LEXIS 61441, at *41 (S.D.N.Y. Aug. 21, 2007);
*Cambridge Holdings Group, Inc. v. Fed. Ins. Co.*, 357 F. Supp. 2d
89, 93 (D.D.C. 2004), *appeal dismissed*, 489 F.3d 1356 (D.C. Cir.
2007), *reh'g denied*, No. 05-7096, 2007 U.S. App. LEXIS 19346
(D.C. Cir. Aug. 13, 2007).

When determining the meaning of a contract, "the initial
resort should be to the four corners of the agreement itself."
*American Flint Glass Workers Union v. Beaumont Glass Co.*, 62 F.3d
574, 581 (3d Cir. 1995) (quotation marks and citation omitted).
"To be unambiguous, an agreement must be reasonably capable of
only one construction." *Washington Hospital v. White*, 889 F.2d
1294, 1300 (3d Cir. 1989) (citation omitted).  "Ambiguity is a
pure question of law for the court." *American Flint*, 62 F.3d at
581 (citations omitted).  To decide whether a contract is
ambiguous, the court "hear[s] the proffer of the parties and
determine[s] if there is objective indicia that, from the
linguistic reference point of the parties, the terms of the
contract are susceptible of differing meanings." *Mellon Bank,*

*Addie, et al. v. Kjaer, et al.*
Civil No. 2004-135
Memorandum Opinion
Page 16

*N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir. 1980).

Article I of the Escrow Agreement provides for the Buyers to deposit with Premier an initial installment of $1,000,000 (the "Initial Escrow Money") and a second installment of $500,000 (the "Second Escrow Money"). Article I further provides that both installments "shall be held and distributed by the Escrow Agent in accordance with the terms and conditions of this Agreement." (Pls.' Mot. for Summ. J. on Conversion Cl., Exh. 3 at 1-2.)

Article II of the Escrow Agreement describes how the Escrow Money is to be distributed. With respect to the Initial Escrow Money, the Escrow Agreement provides as follows:

> 2.1 <u>Distribution of Initial Escrow Money</u>. The Initial Escrow Money shall be released by Escrow Agent to Seller twenty-four hours following delivery of the following to the Escrow Agent with a copy to the Buyer, so long that Buyer has also delivered a written notice to Escrow Agent stating that it is satisfied, with the Escrow Documents (as defined below):
>
> > (i)  the following documents (the "Escrow Documents") shall be delivered into Escrow with a copy to Buyer:
> >
> > 1.  Insurable Warranty Deed from Seller to Buyer or its assigns for the Island;
> > 2.  Insurable Warranty Deed from Seller to Buyer or its assigns for the Nazareth Property;
> > 3.  Assignments of all permits, submerged land leases and other licenses necessary for the existence and occupancy of the dock and other improvements on the Island and the Nazareth Property, together with the required governmental consent thereto including but no limited to assignments of CZM Permits;

*Addie, et al. v. Kjaer, et al.*
Civil No. 2004-135
Memorandum Opinion
Page 17

     4.   A Foreign Investment in Real Property
         Tax Act ("FIRPTA") Affidavit;

     5.   Seller's Affidavit as may be reasonably
         requested by Buyer's title insurance
         company; and

     6.   An ALTA Form B Owner's Title Insurance
         Policy in the Seller's name showing that
         the Island and the Nazareth Property are
         free and clear of all exceptions.

(*Id.* at 2.)

The Escrow Agreement provides that the Second Escrow Money

shall be released by Escrow Agent to Seller upon
receipt by Escrow Agent from Buyer, after the date of
the deposit of the Second Escrow Money, of a written
notice that it is fully satisfied that title to the
Island and the Nazareth Property are free and clear of
any liens, defects, objections, zoning or deed
restriction violations or encroachments.

(*Id.*)

D'Amour states that the Escrow Agreement is ambiguous.  To

establish as much, he relies on the Buyers' and the Sellers'

contracts for the purchase of the two parcels of land.  He points

to a clause in those contracts allowing the Buyers, at all times

before closing, to notify the Sellers of any title objections.

That clause then directs the Sellers to cure such objections.  If

the objections are not cured timely or at all, the Buyers may

elect to terminate the contracts and receive a refund of the

Escrow Money, or proceed to closing despite the objections.

D'Amour asserts that because the closing date was September

4, 2004 and the Sellers did not notify the Sellers of their

objections until September 22, 2004, those objections are

*Addie, et al. v. Kjaer, et al.*
Civil No. 2004-135
Memorandum Opinion
Page 18

untimely.  According to D'Amour, "[a] reasonable reading of the
contract provision would limit [the Buyers'] time to object until
the deadline for closing, not weeks later." (Def. D'Amour's Mem.
in Opp'n to Pls.' Mot. for Summ. J. on Conversion Cl. at 10.)  In
D'Amour's view, the Buyers' contention that their objections are
not untimely is discordant with other provisions in the land
contracts, specifically a clause that makes the Buyers' $750,000
deposit non-refundable.  These arguments are both confusing and
unpersuasive.

First, the mere fact that the parties' respective readings
of their contracts are inconsistent with one another, does not
necessarily render those contracts ambiguous. *See John Morrell &*
*Co. v. Local Union 304A of United Food & Commercial Workers*, 913
F.2d 544, 565 (8th Cir. 1990) ("[A] mere difference of opinion as
to the proper interpretation does not render the contract
ambiguous as a matter of law.") (citation omitted); *Saudi Am.*
*Bank v. Shaw Group, Inc. (In re Stone & Webster, Inc.)*, Civ. No.
04-834, 2005 U.S. Dist. LEXIS 7912, at *20 (D. Del. May 3, 2005)
("Contractual language is not rendered ambiguous simply because
the parties do not agree upon its proper construction.")
(quotation marks and citations omitted).

Second, the land contracts and the Escrow Agreement make
clear that the deposit and the Escrow Money are distinct from one
another.  As a consequence, D'Amour's reference to the non-

*Addie, et al. v. Kjaer, et al.*
Civil No. 2004-135
Memorandum Opinion
Page 19

refundable deposit in support of his argument that the Escrow

Agreement is ambiguous, is perplexing.

Finally, although an escrow agreement is normally read in

conjunction with the agreement governing the underlying

transaction, D'Amour's references to purported ambiguities in the

land contracts are really an attempt to inject ambiguity into an

associated agreement that has none.  The question whether the

land contracts required objections to be filed before closing has

no bearing on the very clear duties and conditions imposed on the

parties by the Escrow Agreement.

In the Court's view, the Escrow Agreement is facially

unambiguous.  Consequently, the Court must give effect to its

plain language. *See*, *e.g.*, *GTE Corp. v. Allendale Mut. Ins. Co.*,

372 F.3d 598, 609 (3d Cir. 2004) ("Because the contract in this

case is clear and unambiguous, it must be enforced as written.")

(alterations, quotation marks and citation omitted).

The Escrow Agreement requires Premier to release the Escrow

Money.  The Escrow Agreement also clearly provides that Premier's

duty to release the Escrow Money does not mature "so long that"

Premier receives written notice from the Buyers evidencing the

Buyers' satisfaction with certain documents.  That language

conditions the release of the Escrow Money on the existence of

some other condition: written notice of satisfaction by the

*Addie, et al. v. Kjaer, et al.*
Civil No. 2004-135
Memorandum Opinion
Page 20

Buyers.[10] *See*, *e.g.*, *Terra Indus. v. Nat'l Union Fire Ins.*, 383 F.3d 754, 760 (8th Cir. 2004) (noting that "'so long as' . . . frequently foretell[s] [a] condition[] precedent"). Similarly, the Escrow Agreement's mandate that Premier release the Second Escrow Money "upon" receipt of the Buyers' written notice indicates that the release of the Escrow Money had to occur after receipt of the notice. *See*, *e.g.*, *Sperry Corp. v. United States*, 845 F.2d 965, 969 (Fed. Cir. 1988) (finding that "the word 'upon' necessarily means 'shortly afterward'").

In support of their motion, the Buyers rely on the deposition testimony of various individuals involved in the underlying transaction for the sale of the two parcels of land. That testimony shows that D'Amour released the Initial Escrow Money to the Sellers on August 5, 2004 and the Second Escrow Money on August 25, 2004. That testimony further shows that the Escrow Money was released without compliance with the express

---

[10] D'Amour disputes that the Buyers had legal title to the Escrow Money when he released it to the Sellers. He asserts that he released the funds only after delivery of the documentation described in the Escrow Agreement and receipt of the Buyers' written notice. That assertion is unsupported by the record. The record reflects no evidence whatever that the Buyers conveyed their satisfaction with the documentation. The Escrow Agreement makes clear that the Buyers' satisfaction was a condition of the release of the Escrow Money. The nonoccurrence of that condition means that title to the Escrow Money remained with the depositors -- the Buyers. *See Clancy v. Goldberg*, 183 B.R. 672, 676 (N.D.N.Y. 1995) ("When money is deposited in escrow, ownership of that money remains in the depositor of the funds until the conditions of the agreement are fulfilled.") (citations omitted).

*Addie, et al. v. Kjaer, et al.*
Civil No. 2004-135
Memorandum Opinion
Page 21

terms of the Escrow Agreement.  That is, the conditions precedent
to the release of the Escrow Money did not occur.

D'Amour fully acknowledges the terms of the Escrow
Agreement.  He argues, however, that its wording "contains a
mandatory requirement provision for release of the funds, rather
than a prohibition on release[.]" (Defs.' Joint Resp. to Pls.'
Statement of Undisputed Material Facts Relating to Pls.' Mot. for
Summ. J. on Conversion Cl. at 2.)  D'Amour cites no authority
whatever to buttress that interpretation.  Indeed, that
interpretation effectively neuters the Escrow Agreement, renders
meaningless the well-established principles of contract law
articulated above and contradicts clear Virgin Islands law
requiring escrow agents to faithfully follow the instructions
provided in the escrow agreement.[11]

Because D'Amour personally released the Escrow Money in
contravention of the express conditions of the Escrow Agreement,
the Court finds that the Buyers have met their initial burden of
showing that D'Amour converted the Escrow Money.  The burden

---

[11]  Under Virgin Islands law,

[a] written promise is delivered in escrow by the
promisor when he puts it into the possession of a
person other than the promisee without reserving a
power of revocation and manifests an intention that the
document is to take effect according to its terms *upon
the occurrence of a stated condition but not otherwise*.

Restatement (Second) of Contracts § 103(1) (emphasis supplied).

*Addie, et al. v. Kjaer, et al.*
Civil No. 2004-135
Memorandum Opinion
Page 22

therefore shifts to D'Amour to rebut the Buyers' evidence.

D'Amour seeks to avoid liability on several grounds. D'Amour argues, for instance, that he cannot be liable for conversion because he no longer possesses the Escrow Money, having released it to the Sellers. D'Amour relies on Comment f to Section 237 of the Restatement, which immunizes a defendant against conversion liability where he no longer possesses the property. That selective reference presumes that there was no misdelivery by a defendant.

Section 237 of the Restatement provides that

> [o]ne in possession of a chattel as bailee or otherwise who, on demand, refuses without proper qualification to surrender it to another entitled to its immediate possession, is subject to liability for its conversion.

Restatement (Second) of Torts § 237 (1965). Comment f to Section 237 provides that

> [t]he refusal to surrender a chattel upon demand is not a conversion if the person upon whom the demand is made *does not have possession of the chattel at the time of the demand.*

*Id.* at cmt. f (emphasis supplied). Notwithstanding that apparent liability shield, Comment f further provides that

> [i]f the goods have been disposed of or intentionally destroyed, either properly or improperly, the actor is not liable for his refusal to surrender them, *although he may be liable for the destruction or disposition under the rules stated in § 226 or §§ 233-236.*

*Id.* (emphasis supplied). Section 234, to which Section 237 specifically refers, provides:

Addie, et al. v. Kjaer, et al.
Civil No. 2004-135
Memorandum Opinion
Page 23

>A bailee, agent, or servant who makes *an unauthorized delivery of a chattel is subject to liability for conversion* to his bailor, principal, or master unless he delivers to one who is entitled to immediate possession of the chattel.

*Id.* at § 234 (emphasis supplied).

The authority outlined above makes clear that D'Amour has overlooked the Restatement's imposition of conversion liability on one who misdelivers a chattel and therefore no longer possesses it.  D'Amour's defense that he is no longer in possession of the Escrow Money is therefore deficient.

D'Amour also argues that he received written authorization from the Buyers to release the Escrow Money.  In essence, D'Amour contends that the Buyers consented to the release of the Escrow Money.  It is true "that there can be no conversion where an owner either expressly or impliedly assents to or ratifies the taking, use or disposition of his property." *Bank of N.Y. v. Fremont Gen. Corp.*, 523 F.3d 902, 915 (9th Cir. 2008) (alteration, quotation marks and citation omitted); *see also Pan Eastern Exploration Co. v. Hufo Oils*, 855 F.2d 1106, 1125 (5th Cir. 1988); *Chemical Sales Co. v. Diamond Chemical Co.*, 766 F.2d 364, 369 (8th Cir. 1985).  A defendant may rely on "the consent of the person entitled to immediate possession *or that of one who has power to consent for him*, or by implication from the terms of the transaction." Restatement (Second) of Torts § 235 cmt. c (1965) (emphasis supplied).  Consent is ordinarily a question of

*Addie, et al. v. Kjaer, et al.*
Civil No. 2004-135
Memorandum Opinion
Page 24

fact for a jury to decide. *See*, *e.g.*, *Pan Eastern Exploration Co.*
*v. Hufo Oils*, 855 F.2d 1106, 1126-27 (5th Cir. 1988); *Asousa*
*P'ship v. Smithfield Foods, Inc. (In re Asousa P'ship)*, Bankr.
No. 01-12295DWS, 2006 Bankr. LEXIS 1463, at *53 (Bankr. E.D. Pa.
June 15, 2006) (denying a summary judgment motion because "there
is a question of fact as to whether [one party] authorized the
conversion of rent monies allegedly held in escrow").

D'Amour also appears to collapse his consent defense with a
waiver defense.  Waiver is an affirmative defense to conversion.
18 Am. Jur. 2d Conversion § 111.  "The elements of waiver are:
(1) an existing right, benefit, or advantage; (2) knowledge,
actual or constructive, of its existence; and (3) actual intent
to relinquish the right, which can be inferred from conduct."
*First Interstate Bank, N.A. v. Interfund Corp.*, 924 F.2d 588, 595
(5th Cir. 1991); *see also Billman v. V.I. Equities Corp.*, 743
F.2d 1021, 1024 (3d Cir. 1984) (citing Restatement (Second) of
Contracts § 89 (1981)).  "Generally, waiver is a fact question
turning on the question of intent." *First Interstate Bank*, 924
F.2d at 595 (citation omitted); *see also*, *e.g.*, *United States v.*
*Continental Grain Co.*, 691 F. Supp. 1193, 1197 (W.D. Wis. 1988)
(concluding that whether a party's conduct constituted a waiver
of the party's "right to require written consent to the sale, is
a question of fact") (citation omitted).

*Addie, et al. v. Kjaer, et al.*
Civil No. 2004-135
Memorandum Opinion
Page 25

To support his consent and waiver defenses, D'Amour relies principally on his communications with the Buyers.  Between June 4 and September 8, 2004, D'Amour engaged in several communications with Perez and Addie, mostly via email.  On July 30, 2004, D'Amour sent an email to Addie, Perez, and Attorney Michael Hayden[12], asking for confirmation that Premier could release the Escrow Money to the Sellers:

> Please confirm today that the Escrow Agent may release the funds to the Sellers.  We have waited far beyond the time set forth in the Escrow Agreement.  The documents were originally sent on August 20th and again on August 28th.  The Escrow Agreement requires release of the escrowed funds within 24 hours of receipt of the documents.

(Def. D'Amour's Opp'n to Pls.' Mot. for Summ. J. on Conversion Cl., Exh. 4 at 2.)

On August 2, 2004, D'Amour sent an email to Perez, asking for confirmation that the Initial Escrow Money could be released: "Please confirm today that the First Deposit [may be released] to Seller[s] today." (*Id.* at 4.)  In that same email, D'Amour also referred to the Second Escrow Money: "Also confirm that the Second Deposit has been wire transferred.  Yesterday you confirmed that you had the wire transfer instructions.  I trust you will forward a copy of this to Hank Smock, if necessary."

---

[12]  Michael Hayden represented the Buyers in the underlying transaction until June 4, 2004.

*Addie, et al. v. Kjaer, et al.*
Civil No. 2004-135
Memorandum Opinion
Page 26

(*Id.*)[13]

On August 3, 2004, Perez sent an email back to D'Amour, stating that he had

> spoken to Hank Smock, [who] has advised me that we can go ahead and release the first deposit of $1,000,000.00 today.  As I mentioned to you on the telephone, I will be wiring the second deposit of $500,000.00 between today and Friday August 6th.

(Pls.' Mot. for Summ. J. on Conversion Cl., Exh. 10 at 6.)

Thereafter, D'Amour released both the Initial Escrow Money and the Second Escrow Money to the Sellers.

D'Amour argues that Perez's August 3, 2004, email evidences the Buyers' authorization for D'Amour to release the Escrow Money.  D'Amour also relies on Perez's deposition testimony that the word "we" in that email referred to all three of the Buyers.[14]

The Buyers claim that Perez neither authorized the release

---

[13] Henry Smock represented the Buyers in the underlying transaction beginning on June 4, 2004.

[14] During Perez's deposition, the following exchange took place:

Q    When you sent your email to Mr. D'Amour on August 3rd, telling him that you had spoken to Hank Smock and he had advised you that: "We can go ahead and release the first deposit of $1 million today," who was the we referred to in that sentence?

A    The we would be myself, Jason Taylor and Robert Addie.

(Perez Dep. 264:3-9, Nov. 5, 2007.)

*Addie, et al. v. Kjaer, et al.*
Civil No. 2004-135
Memorandum Opinion
Page 27

of the Escrow Money nor had the authority to act on his co-plaintiffs' behalf.  The Buyers point to Perez's deposition, during which the following exchange took place:

> Q    Did you and Mr. Addie discuss giving confirmation
>      that the escrow agent could release the funds to
>      the sellers?
>
> A    I don't believe we spoke in those, in those terms
>      about that, no.
>
> Q    Okay.  Did Mr. Addie ever tell you that he agreed
>      the funds could be released to the sellers?
>
> A    I don't believe he ever told me that, no.
>
> Q    Did you ever tell him that you agreed they could
>      be released?
>
> A    I don't believe I ever told him that either.
>
> Q    Did Mr. Taylor ever tell you that he agreed they
>      could be released?
>
> A    I don't believe he did either.
>
> Q    Did you ever tell Mr. Taylor that you agreed they
>      could be released?
>
> A    I don't believe I told him that either.

(Perez Dep. 230:8-24, Nov. 7, 2007.)

Because there are material facts in dispute with respect to whether the Buyers authorized D'Amour to release the Initial Escrow Money, that question must be decided by the finder of fact.[15]  *See, e.g., First Interstate Bank*, 924 F.2d at 595

---

[15]  The Buyers argue that D'Amour has adduced insufficient evidence to establish that Perez was authorized to speak on behalf of the other Buyers.  Perez's own deposition testimony belies that argument.  Moreover, "[t]he question of agency, be it

*Addie, et al. v. Kjaer, et al.*
Civil No. 2004-135
Memorandum Opinion
Page 28

(finding no error where the trial court did not rule on the issue
of waiver as a matter of law).

The Second Escrow Money must be assessed against a different
backdrop.  To show that the Buyers authorized him to release the
Second Escrow Money, D'Amour again relies on the August 3, 2004,
email.  In that email, reproduced above, Perez refers to the
Second Escrow Money only to say that he will wire it to D'Amour.
D'Amour also relies on Perez's response to an interrogatory
propounded by the Sellers.  That interrogatory asks:

> Were you consulted by either or both of the other
> Plaintiffs, prior to the transfer of the $500,000
> deposit to the escrow account?  If not, why not?

(Def. D'Amour's Opp'n to Mot. for Summ. J. on Conversion Cl.,
Exh. 8 at 2.)

Perez answered as follows:

> No.  I did not know that the Second Deposit was being
> transferred from the Escrow Agent's escrow account to
> another account, and did not expect that it would since
> the terms of the Escrow Agreement had not been
> satisfied as to the release of the Second Deposit.

(*Id.*)

At most, the evidence on which D'Amour relies suggests that

---

on the basis of actual authority or apparent authority, is
ordinarily a question of fact." *National Football Scouting, Inc.
v. Continental Assurance Co.*, 931 F.2d 646, 649 (10th Cir. 1991)
(citation omitted); *see also Agristor Leasing v. Farrow*, 826 F.2d
732, 734 (8th Cir. 1987) (stating that whether an act is within
the scope of an agent's authority is ordinarily question of
fact).  The conflicting evidence in the record regarding Perez's
authority, or lack thereof, to speak for his co-plaintiffs
precludes summary judgment on this issue.

Addie, et al. v. Kjaer, et al.
Civil No. 2004-135
Memorandum Opinion
Page 29

Perez might have had authorization from his co-plaintiffs to deposit the Second Escrow Money into the escrow account. In no way does that evidence substantiate D'Amour's contention that he was authorized to release the Second Escrow Money.

Where, as here, "the moving party makes a case for summary judgment, the party opposing the motion has an *affirmative duty to set forth specific facts* showing there is a genuine issue for trial." *United Transp. Union v. Conemaugh & B. L. R. Co.*, 894 F.2d 623, 628 (3d Cir. 1990) (emphasis supplied; quotation marks and citation omitted). D'Amour has failed to meet that burden. The Escrow Agreement clearly directs him to release the Second Escrow Money "upon" receipt of the Buyers' written notice of satisfaction. D'Amour has adduced no evidence to show that he received such a notice before releasing the Second Escrow Money. D'Amour has also failed to submit any evidence to show that the Buyers authorized him to release the Escrow Money or waived their rights under the Escrow Agreement.

## IV. CONCLUSION

For the reasons given above, the Buyers' motion for summary judgment on their conversion claim will be denied with respect to the Sellers. The Buyers' motion will be partially granted and partially denied with respect to D'Amour. The Sellers' motion for summary judgment against the Buyers on the Buyers' conversion

*Addie, et al. v. Kjaer, et al.*
Civil No. 2004-135
Memorandum Opinion
Page 30

claim will be granted.  An appropriate order follows.


                                          S_____
                                             **CURTIS V. GÓMEZ**
                                              **Chief Judge**