# DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

ROBERT ADDIE, JORGE PEREZ and )
JASON TAYLOR,                  )
                               )
            Plaintiffs,        )
                               )          Civil No. 2004-135
       v.                      )
                               )
CHRISTIAN KJAER, HELLE         )
BUNDGAARD, STEEN BUNDGAARD,    )
JOHN KNUD FÜRST, KIM FÜRST,    )
NINA FÜRST, and KEVIN F.       )
D'AMOUR,                       )
                               )
            Defendants.        )
_____)

ATTORNEYS:

**Gregory H. Hodges, Esq.**
St. Thomas, U.S.V.I.
         *For the plaintiffs.*

**Carol G. Hurst, Esq.**
St. Thomas, U.S.V.I.
         *For defendants Christian Kjaer, Helle Bundgaard, Steen
         Bundgaard, John Knud Fürst, Kim Fürst, and Nina Fürst.*

**Maria T. Hodge, Esq.**
St. Thomas, U.S.V.I.
         *For defendant Kevin F. D'Amour.*

## <u>MEMORANDUM OPINION</u>

Before the Court are the motions of the defendant Kevin

D'Amour ("D'Amour") for judgment as a matter of law, amended

judgment, or alternatively, for a new trial.

## I. <u>FACTS</u>

Robert Addie, Jorge Perez and Jason Taylor (collectively the

"Buyers"), entered into Contracts of Sale (the "Land Contracts") to purchase two parcels of land from the Sellers: Great St. James Island, St. Thomas, U.S. Virgin Islands ("Great St. James"), and Parcel No. 11 Estate Nazareth, No. 1 Red Hook Quarter, St. Thomas, U.S. Virgin Islands ("Estate Nazareth"). The Buyers also signed an Escrow Agreement in which they agreed to pay $1.5 million into an escrow account managed by Premier Title Company, Inc., formerly known as First American Title Company, Inc. ("First American Title"). At all times relevant, defendant D'Amour was First American Title's president and sole shareholder. D'Amour also acted as counsel to the Sellers.

Neither parcel of land was conveyed as the parties contemplated. The Buyers demanded the return of the escrow money. The escrow money was not returned. This action ensued.

The Buyers alleged the following: breach of contract; fraud by certain defendants; fraud by D'Amour; conversion; breach of fiduciary duty by Premier; and unjust enrichment. The Buyers also sought a declaration that: they are entitled to terminate the land contracts; the Sellers cannot deliver marketable title to the land; and the Sellers have defaulted under the terms of the land contracts. The Sellers asserted two counterclaims, one for fraudulent misrepresentation and another for breach of contract against the Buyers.

In August 2008, the Buyers sought summary judgment on their conversion claim against the Sellers, Premier and D'Amour. The Sellers opposed the motion and filed a cross-motion for summary judgment on that claim. Premier and D'Amour also opposed the Buyers' motion.

On February 23, 2009, the Court denied the Buyers' motion with respect to the Sellers and granted the Sellers' crossmotion. With respect to D'Amour, the Court denied the Buyers' motion with respect to $1 million of the Buyers' escrow money but granted the motion with respect to $500,000 of that money[1]. The Court entered judgment against D'Amour in the amount of $500,000.

This matter was tried to a jury from June 22, 2009 to July 2, 2009. Following deliberations, the jury found D'Amour liable for fraud and not liable for conversion of $1 million of the escrow money.

D'Amour now moves for judgment as a matter of law to be entered in his favor on the fraud and conversion claims. D'Amour also moves to alter or amend the judgment. In the alternative, he seeks a new trial. The Buyers oppose that

---

[1]The Escrow Agreement provided for two possible deposits into the escrow account. The initial deposit of $1 million was mandatory under the terms of the Escrow Agreement. The Agreement also featured an optional second deposit under which the Buyers could "[p]ursuant to the Contracts of Sale . . . extend the Closing Date (as defined in the Contracts of Sale) by thirty (30) days by depositing an additional $500,000" into the escrow account. (Trial Ex. 64.)

motion.

## II. <u>DISCUSSION</u>

Judgment as a matter of law pursuant to Rule 50 should be granted "only if, viewing the evidence in the light most favorable to the nonmovant and giving [the nonmovant] the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1166 (3d Cir. 1993). " 'The question is not whether there is literally no evidence supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly have found its verdict.'" *Johnson v. Campbell*, 332 F.3d 199, 204 (3d. Cir. 2003)(quoting *Gomez v. Allegheny Health Servs. Inc.*, 71 F.3d 1079, 1083 (3d Cir. 1995)).

Rule 59 provides for a motion to alter or amend a judgment. FED. R. CIV. P. 59. A court may grant a motion for an altered or amended judgment if the movant shows: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion . . . ; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café ex rel. Lou-Ann, Inc. V. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).

A motion for a new trial pursuant to Federal Rule of Civil

Procedure 59 may be granted "on all or some of the issues— and to

any party. . . ." FED. R. CIV. P. 59 (a). "A new trial is most

commonly granted in select situations, including (1) when the

jury's verdict is against the clear weight of the evidence; (2)

when new evidence surfaces that would have altered the outcome of

the trial; (3) when improper conduct on the part of any attorney

or the court unfairly influenced the verdict; or (4) where the

jury's verdict was facially inconsistent." *E.E.O.C. v. Aldi, Inc.*

2009 WL 3183077, at *6 (W.D. Pa. Sept. 30, 2009)(citing *Davis v.*

*Mountaire Farms, Inc.,* 598 F. Supp.2d 582 , 587 (D. Del. 2009)).


### III. <u>ANALYSIS</u>

**A. D'Amour's Motion for Judgment as a Matter of Law or for a New Trial on the Standard of Proof For the Fraud Claim**

D'Amour asserts that this Court's ruling at trial that the

standard of proof for fraud is preponderance of the evidence was

in error. Section 740 of Title 5 of the Virgin Island Code

explicitly states that, in a civil case, "the affirmative of the

issue shall be proved, and when the evidence is contradictory *the*

*finding shall be according to the preponderance of the evidence*

[.]" V.I. CODE ANN. tit. 5, § 740.(emphasis supplied).  This

standard applies to all civil claims in the Superior Court of the
Virgin Islands.  This Court, sitting in diversity, is obligated
to apply that standard to civil fraud claims absent some
exception or contrary provision for such claims.  *See Lafferty v.
St. Riel*, 495 F.3d 72, 76 (3d Cir. 2007)(citing *Erie R.R. Co. v.
Tompkina*, 304 U.S. 64, 78 (1938)).  The Virgin Islands Code
offers no such exception or special provision for fraud claims.
Accordingly, common law fraud claims in the Virgin Islands are
subject to a preponderance of the evidence standard.

D'Amour cites the *Gov't of the V.I. v. Smith*, 949 F.2d 677,
683 (3d Cir. 1991), in support of his argument that controlling
precedent mandates the use of a clear and convincing evidence
standard for civil fraud claims in the Virgin Islands.  In *Smith,*
the Court of Appeals for the Third Circuit addressed the
appropriate burden of proof under Virgin Islands law on the
unlawfulness element of self-defense in a murder trial. 949 F.2d
at 682-83.

In evaluating the absence of an instruction on the element
of unlawfulness, the Court cited to, *Beardshall v. Minuteman
Press, Int'l, Inc.,* 664 F.2d 23, 26-27 (3d Cir. 1981), another
Third Circuit case.  In *Beardshall,* the Third Circuit held that
the trial court had erred in instructing the jury that the
standard in a fraud case was preponderance of the evidence.

There, the Third Circuit discussed the appropriate standard for a fraud case under Pennsylvania law.[2]  That discussion does not control this Court's application of the standard under Virgin Islands law.  Here, the relevant source of law is the Virgin Islands Code.

D'Amour also cites to *In re Burke*, 2008 WL 5455721, * at 4 (V.I. Dec. 31, 2008) and *Hodge v. McGowan*, 2008 WL 4924628, at *12 (V.I. Nov. 10, 2008), as two cases where the Supreme Court of the Virgin Islands used the clear and convincing standard of proof in evaluating civil claims.  However, D'Amour neglects to acknowledge the significant distinction between the claims presented in those two cases, civil contempt and adverse possession, and the fraud claim on which he was found liable.

For civil contempt cases, courts have long recognized the governing standard as "clear and convincing." *See, e.g.*, *United States v. Rizzo*, 539 F.2d 458, 465 (5th Cir. 1976)("In a civil contempt action the proof of the defendant's contempt must be 'clear and convincing', a higher standard than the 'preponderance of the evidence' standard, common in civil cases . . . .").  The Court of Appeals for the Third Circuit has expressly approved of

---

[2]In *Beardshall,* the Third Circuit noted that the Supreme Court of Pennsylvania articulated the standard of proof in fraud and intent to defraud cases as "'evidence that is clear, precise and convincing.'" 664 F.2d 23 (3d Cir. 1981)(quoting *Snell v. Pennsylvania*, 416 A.2d 468,470 (1980)).

the "clear and convincing" standard for civil contempt cases.
*Quinter v. Volkswagen of America*, 676 F.2d 969, 974 (3d Cir.
1982)(*quoting Fox v. Capital Co.*, 96 F.2d 684, 686 (3d Cir.
1938)); *Schauffler v. Local 1291*, 292 F.2d 182, 189 (3d Cir.
1961)("It is well settled that the petitioner in a civil contempt
proceeding must prove a violation of the court's order by more
than a mere preponderance of the evidence."). There has been no
similar judicially established standard for fraud claims.

For adverse possession, the language of the statute
implicates the burden of proof. Section 11 of Title 28 of the
Virgin Islands Code, provides that "[t]he uninterrupted,
exclusive, actual, physical adverse, continuous, notorious
possession of real property under claim or color of title for 15
years or more shall be *conclusively presumed* to give title
thereto, except as against the Government." V.I. CODE ANN. tit. 28
§ 11 (emphasis supplied). The conclusive presumption furnished
in 28 V.I.C. § 11 supports the application of the heightened
clear and convincing standard to rebut that presumption.

D'Amour has failed to point to any authority mandating the
use of the clear and convincing evidence standard for fraud
claims. The Court thus finds no need to revisit its
determination that the preponderance of the evidence standard was
the appropriate standard in this matter.

**B. D'Amour's Motion for Judgment as a Matter of Law or For a New Trial on the Fraud Claim**

D'Amour argues that no reasonable juror could find from the evidence presented at trial that he committed fraud.  In order to prevail on a fraud or misrepresentation claim, a complainant must establish: "(1) a knowing misrepresentation of a material fact, (2) intent by the defendant that the plaintiff would rely on the false statement, (3) actual reliance, and (4) detriment as a result of the reliance." *Mendez v. Coastal Sys. Dev., Inc.,* 2008 WL 2149373, at *10 (D.V.I. May, 20 2008)(footnote omitted).

The Buyers alleged that D'Amour committed fraud in several ways.  They claimed that D'Amour fraudulently represented the Sellers ability to deliver valid escrow documents ("Escrow Documents") as promised in the Escrow Agreement[3], made false

---

[3]Article II of the Escrow Agreement provides in pertinent part:
(i) the following documents (the "Escrow Documents" shall be delivered into the Escrow with a copy to the Buyer:
    1. Insurable Warranty Deed from Seller to Buyer or its assigns for the Island;

    2. Insurable warranty Deed from Seller to Buyer or its assigns for the Nazareth Property;

    3. Assignments of all permits, submerged land leases and other licenses necessary for the existence and occupancy of the dock and other improvements on the Island and the Nazareth Property, together with the required governmental consent thereto including but no limited to assignments of CZM Permits;

    4. Foreign Investment in Real Property Tax Act ("FIRPTA") Affidavit

    5. Seller's Affidavit as may be reasonably requested by Buyer's title insurance company; and

statements about the Buyers' obligation to release escrow funds,

made false statements about Sellers' ability to deliver clear and

marketable title, and failed to disclose his interest in the

escrow agency, First American Title.  A finding that D'Amour

committed only one of the fraudulent acts alleged would have been

sufficient.  In his motion D'Amour has raised issues with respect

to the sufficiency of the evidence presented as to each

allegation of fraud.  The Court will thus address D'Amour's

arguments on each individual allegation of fraud.

### 1. Escrow Documents

#### a. The Minor Coastal Zone Permits

The Buyers alleged that D'Amour committed fraud in

representing that he could tender valid Escrow Documents that

satisfied the conditions of the Escrow Agreement. At trial, the

Buyers presented evidence that D'Amour despite knowing that

permits for docks on the Great St. James and Nazareth properties

were expired, represented that his clients "could and would

deliver valid assignments of all permits necessary for the

existence and occupancy of the docks, together with governmental

---

6. An ALTA Form B Owner's Title Insurance Policy in the Seller's name showing that the Island and the Nazareth Property are free and clear of all exceptions.

(Trial Ex. 64.)

consents . . . ." (Pls.' Opp. to Def. D'Amour's Renewed Mot. for
J. as a Matter of Law 8.)

D'Amour contends that the Buyers' claim with respect to his
statements about the Coastal Zone Management ("CZM") permits
essentially challenges statements related to the underlying Land
Contracts and Escrow Agreement.(D'Amour's Reply to Pls.' Opp. to
Renew. Mot. for J. As a Matter of Law 5.)  As such, D'Amour
argues that "Buyers remedy should be limited to a contract remedy
. . . [S]imply using an Attorney in Fact should not convert all
breach of contract into fraud claims . . . ." *(Id.)*

The Virgin Islands Code does not specifically address the
treatment of a misrepresentation made in the course of contract
discussions.  The Court thus looks to the Restatement (Second) of
Torts, which provides:

> (1) A representation of the maker's own intention to do
> or not to do a particular thing is fraudulent if he
> does not have that intention.
> (2) A representation of the intention of a third person
> is fraudulent under the conditions stated in § 526.

RESTATEMENT (SECOND) OF TORTS § 530 (1977).  That section further
notes that a misrepresentation of a promise to perform related to
an agreement does not confine a wronged party to a contract cause
of action.  Indeed, "it is immaterial to the tort liability that
the damages recoverable are identical with, or substantially the
same as, those which could have been recovered in an action of

contract if the promise were enforceable."[4] *Id.* cmt. c.  As such,

D'Amour's attempt to circumscribe any misrepresentation related

to a promise in the Land Contracts or Escrow Agreement to a

contract claim is unavailing.

In an October 29, 2001 letter, D'Amour wrote to Althea V.

Grant, Budget/ Financial Coordinator of the Government of the

Virgin Islands.  He noted that "[y]ou advised me that permit

number CZT-39-87W has expired . . . ." (Trial Ex. 11.)

Additionally, in a July 10, 2002 letter that the Commissioner of

the Department of Planning and Natural Resources, Dean Plaskett,

Esq., sent to Kjaer in care of D'Amour, the Commissioner made

plain that "CZT-39-87W has expired and must be renewed prior to

assignment or transfer." (Trial Ex. 19.)  No effort to renew that

---

[4] The Court notes that in some instances the gist of the action doctrine impacts a tort claim that is linked to a contract. "[T]he gist of the action doctrine bars plaintiffs from bringing a tort claim that merely replicates a claim for breach of an underlying contract." *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 680 n. 8 (3d Cir. 2002) (applying Pennsylvania law) (quotation marks and citation omitted). Pursuant to the "gist of the action" analysis, in order for a contract-related tort action to be considered an independent, viable cause of action, "the [tortious] wrong ascribed to the defendant must be the gist of the action with the contract being collateral." *Bohler-Uddehom America, Inc. v. Elwood Group, Inc.* 247 F.3d 79, 103 (3d Cir. 2001).

D'Amour as a party to neither the Land Contracts nor the Escrow Agreement cannot reasonably claim that the contract is the gist of the action against him. *See, e.g., CentiMark Corp. v. Pegnato & Pegnato Roof Mgmt.*, Civil No. 05-708, 2008 U.S. Dist. LEXIS 37057, at *38 (W.D. Pa. May 6, 2008)(holding that the defendants could not avail themselves of the gist of the action doctrine to prevent litigation of a conversion claim against them individually, "because they, as individuals, were not parties to the contract with Centimark"); *Levert v. Phil. Int'l Records*, 2005 U.S. Dist. LEXIS 20309, at *9-10 (finding that defendant's gist of the action defense was untenable because "he was not a party to any contract"). Thus the gist of the action doctrine does not govern the fraud claim against D'Amour presented here.

permit was undertaken prior to the date the permits were tendered to the Buyers as part of the Escrow Documents.  The jury could have reasonably found from this evidence that D'Amour was aware that the permits were expired and promised that the Sellers would assign valid permits, with an intent that such promise would not be fulfilled.

D'Amour further argues that there was no evidence that he "specifically stated that the permits were not expired." (D'Amour's Mem. Of Law in Support of his Renewed Mot. for J. as a Matter of Law, Amended J., or New Trial 12.)  D'Amour did however promise the Buyers that, at closing, the Sellers would provide the Buyers with "[a]ssignments of all permits, submerged land leases and other licenses necessary for the existence and occupancy of the dock and other improvements on the Real Property, together with the required governmental consents thereto."(Trial Ex. 365, Contract of Sales, 14h(7).)  He asserts that the assignment provision in the Contracts of Sale was in effect "a quit claim [sic] conveyance of Sellers' rights under any permits, any submerged land leases, or any other licenses necessary for the existence and occupancy of the dock and other improvements on the property, and not a warranty that Buyers will receive enforceable permits . . . ." (D'Amour Mem. of Law in Supp. of his Renew. Mot. for J. As a Matter of Law 9.)  The

language "necessary for the occupancy of the dock" bears no indication of the quitclaim character that D'Amour asserts.

D'Amour further challenges the notion that his statements about the Sellers' ability to convey CZM permits could constitute fraud, because he contends there was no injury. Specifically, he notes that the testimony of the architect who was involved in the Buyers' development plans, William Karr ("Karr"), indicates that the Buyers were not going to use the docks. D'Amour suggests that "there is no showing that technical defect in the permit prevented Buyers from getting financing . . . [t]he evidence showed that Buyers hired William Karr to apply for permits for docks to replace the existing docks." (D'Amour Mem. of Law in Supp. of his Renew. Mot. for J. As a Matter of Law 10.) Though Karr did testify that there was some appraisal that the docks in their current form were inadequate to meet the anticipated needs of the Buyers' plans for the development of Great St. James, his testimony does not establish that the Buyers did not intend to use the docks. Taylor's testimony indicated otherwise. He testified that he viewed both docks as important because they served as a means of access to "the mainland." (Excerpt: Testimony of Jason Taylor Trial Tr. at 88, June 22, 2009.)

D'Amour further points to a CZM permit application that Karr

filed on behalf of TAP enterprises, a nascent corporation[5]

consisting of the Buyers.  He asserts that the filing of that

permit demonstrates that the Nazareth and Great St. James docks

were not important to the Buyers' efforts to raise funds to

purchase Great St. James.  However, Karr's testimony about his

CZM application indicates that the application was aimed at

addressing overarching developmental plans and did not eradicate

the need for the Great St. James and Nazareth docks:

> Q. And, Mr. Karr, what were you asking CZM to permit
> TAP Enterprises to do?
>
> A. To subdivide the three parcels that consists of the
> island itself and to -- additional parcels, added
> parcels to be used for residential purposes and one
> parcel to be used for commercial purposes.

(Trial Tr. at --, Jun. 24, 2009.)  Mr. Karr's testimony does not

establish that the Buyers did not consider the docks as a

significant feature of the properties in entering into the Land

Contracts.  A reasonable juror could thus determine that

D'Amour's misrepresentation about the docks was material and

amounted to fraud.

### b. The FIRPTA Affidavit

D'Amour also objects to the Buyers' allegation that he

---

[5] The Buyers signed a document purporting to be the Articles of
Incorporation for TAP Enterprises.  They never filed that document with the
Office of the Lieutenant Governor as required for incorporation in the Virgin
Islands pursuant to Section 3 of Title 13 of the Virgin Islands Code.

committed fraud when he tendered A Foreign Investment in Real

Property Tax Act ("FIRPTA") Affidavit as part of the Escrow

Documents.  In the FIRPTA Affidavit, he averred that "Christian

Kjaer, Helle Bundgaard, Steve Bundgaard, John Furst, Nina Furst

and Kim Furst are not foreign persons (as that term is defined in

the Internal Revenue Code and Income Tax Regulations as applied

in the U.S. Virgin Islands);" (Trial Ex. 164.)

At trial, D'Amour's testimony revealed that the Sellers were

Danish nationals.  However, D'Amour contends that the FIRPTA

Affidavit was submitted without any intention to mislead the

Buyers.  He notes that given the incompleteness of the affidavit,

any reliance on the document by the Buyers was unreasonable. He

cites defects on the face of the document, such as the entry

"n/a" in the line for respective social security numbers, as well

as the absence of a signature by a notary public.

"Whether reliance on the misrepresentation was justifiable

could vary based on the context of the misrepresentation, such as

whether it was a formal or informal communication, whether the

parties were advised, and the relative knowledge of each party."

*In re Yonkee*, 2009 WL 3193529, *3 (Bankr. N.D. Ill. Oct. 5,

2009).  Though the document lacked some of the formalities

typically associated with an affidavit, the Court finds that the

contents of the document were not so unspecific as to put the

Buyers on notice that they could not rely on it. *Cf. Keybank Nat'l Ass'n v. Moses Lake Indus., Inc.*, 2010 WL 933973, at * 3 (E.D. Wash. Mar. 11, 2010)(discussing Washington courts' determinations that there was no justifiable reliance "when the documents containing the alleged misrepresentation clearly stated that they were drafts and contained explicit disclaimers that they were not to be relied upon.")(citations omitted).  A reasonable juror could find that, an affidavit, without any disclaimer about the dependability of its contents, constituted a representation on which the Buyers could justifiably rely.

## 2. Statements Related to the Release of Escrow Funds

The Buyers alleged that D'Amour committed fraud when he represented that the Sellers were entitled to the release of escrow funds.  Specifically they noted an email urging the release of funds, sent from D'Amour to Jorge Perez, on July 30, 2004:

> Please confirm today that the Escrow Agent may release the funds to the Sellers.  We have waited far beyond the time set-forth in the Escrow Agreement.  The documents were originally sent on August 20th and again on August 28th.  The Escrow Agreement requires release of the escrowed funds within 24 hours of receipt of the documents.
>
> Additionally, please confirm that you will wire the additional deposit to the escrow agent on or before August 3, 2004.

(Trial Ex. 186.)

On July 20, 2004, D'Amour sent a fax to Addie, stating that "[i]n satisfaction of the escrow agreement attached please find the following documents." (Trial Ex. 164.)  Among the documents attached to that fax, were an assignment of permits document and the FIRPTA affidavit.  As discussed above, the Buyers presented testimony that D'Amour knowingly submitted defective assignments of permits and FIRPTA documents, and subsequently, acting as if the Sellers had complied with the terms of the Escrow Agreement, demanded performance from the Buyers.

D'Amour asserts that the express language of the Land Contracts prevented the Plaintiffs' reliance on his representations about that the adequacy of the Escrow Documents. He cites section 14 of the Contracts of Sale which states "[t]his Agreement constitutes the entire agreement between the parties and no representations, agreement, inducements, or provisions other than those expressly set forth herein shall be binding." (Contracts of Sale ¶ 14.)  D'Amour seems to contend that in light of this integration clause, no reasonable jury could have found that the Buyers were entitled to rely on his representations about the agreement.  However, D'Amour signed the Contracts of Sale and the Escrow Agreement in his capacity as attorney-in-fact.  Acting as an agent of the Buyers, he was not a party to either agreement.  As such, the jury could have found that the

Buyers' reliance on statements made to them by D'Amour, apart

from the contractual promises, was reasonable.

Perez offered testimony about his reason for relying on

D'Amour's representation that the Buyers were obligated to

release escrow funds because they had been in receipt of Escrow

Documents for a period longer than the 24 hours provided in the

contract:

> The reason was simple. I had no reason to doubt Mr.
> D'Amour. Mr. D'Amour is an attorney . . . And I think
> he had an oath not to lie to me. So I believed him
> when he gave me his legal opinion of what the document
> said.

(Excerpt Testimony of Jorge Perez Trial Tr. at 32, June 24,
2009.)

D'Amour argues that deeming the Buyers' reliance on

D'Amour's statement reasonable "would effectively double-or

divide- the duty of loyalty for an attorney in a real estate

transaction, so that he is made the legal advisor not only to his

own client but to the opposing party." (D'Amour's Mem. In Support

of his Renew. Mot. For J. Matter Law 10.)  However, an attorney's

duty to provide vigorous advocacy for a client is not mutually

exclusive with her duty not to commit fraud.

Indeed, "admission to the bar does not create a license to

act maliciously, fraudulently, or knowingly to tread upon the

legal rights of others." *Newburger, Loeb & Co., Inc. v. Gross*,

563 F.2d 1057, 1080 (2d Cir. 1977). "Fraud occurs . . . when a
person of ordinary prudence and comprehension would rely on the
misrepresentations." *Mendez,* 2008 WL 2149373, at * 10.  Here, a
jury could have appropriately determined that a reasonable person
would rely on D'Amour's representation that the Escrow Documents
were validly tendered and that Buyers were obligated to release
escrow funds.

### 3. Clear and Marketable Title

#### a. Title Commitment

The Buyers also alleged that D'Amour committed fraud by
representing that the Sellers could deliver clear and marketable
title.  D'Amour argues that the Buyers failed to provide
sufficient evidence that they reasonably relied on D'Amour's
representations that the Sellers would provide clear and
marketable title free from exceptions.  He claims that the only
representations that he made about title were contained in the
Contracts of Sale.  Section 6 of the Contracts of Sale which
details the title obligations, provides in pertinent part:

> TITLE: At closing, Seller shall convey a Clear and
> Marketable title and an insurable Warranty Deed for the
> Real Property to the Buyer.  At all times prior to
> Closing, Buyer shall be allowed to have the title
> examined and shall notify Seller in writing of any
> title defects, title objections, zoning or deed
> restriction violations or encroachments (hereinafter
> all title objections are referred to collectively as

> "Objections"), which may exist. Seller shall diligently
> endeavor to cure such Objections . . . . For purposes
> of this Agreement, "Clear and Marketable title" shall
> be defined as such title as is acceptable to and
> insurable by Buyer's title insurance company on ALTA
> Form B Owner's Policy (or other reasonable form) free
> and clear of exceptions except licenses and easements,
> if any, for public utilities serving only the Real
> Property.

(Contracts of Sale ¶ 6.)

D'Amour again challenges the appropriateness of allowing a claim for fraud against him when the alleged fraudulent misrepresentations stem from his actions as attorney-in-fact. He suggests that the Buyers' claims for such misrepresentations should be properly categorized as breach of contract claims.[6]

D'Amour may be liable for representations he made about the Sellers' ability to carry out promises. The Restatement provides that a maker of statements about the intentions of third persons may be liable for fraud, if the maker of such a misrepresentation:

---

[6]D'Amour highlights the fact that title exceptions listed in the title commitment were not the subject of an objection from the Buyers. Essentially, he asserts that the Buyers had a means under the Contracts of Sale to address title deficiencies but failed to avail themselves of this opportunity. He notes testimony that the Buyers did not request that any exceptions be taken off the policy:
> Q: So specifically in this case, did anyone on behalf of the buyers ask you to remove any of these exceptions from your title policy at that time?
> A: No, ma'm. In fact, they asked us to add exceptions to it.

(Excerpt: Testimony of C. Kjaer & K. D'Amour Trial Tr. at -- , June 26, 2009.) D'Amour's willingness to modify the title commitment though perhaps relevant to his duties under the Land COntracts does not affect his liability for fraud.

        (a) knows or believes that the matter is not as he
        represents it to be,
        (b) does not have the confidence in the accuracy of his
        representation that he states or implies, or
        (c) knows that he does not have the basis for his
        representation that he states or implies.

RESTATEMENT (SECOND) TORTS § 526 (1977).  As such, D'Amour may be

liable for an intentional misrepresentation with regard to the

Sellers' ability to convey "Clear and Marketable title" as

defined under the Land Contracts.

     D'Amour argues that "[p]laintiffs failed to show and

provided no evidence that these additional title exceptions

proximately caused their injuries." (D'Amour's Mem. of Law in

Supp. of his Renew. Mot. for J. as a Matter of Law 6.)  He argues

that the Buyers were aware of the Open Shorelines Act[7], which

prohibits restrictions on public access to Virgin Islands

beaches.  He also argues that title exception 14 "Terms,

conditions and provisions contained in certain Right of Way

Agreement dated January 8, 1953, by and between Robert F. Smith

and Richard Falck and Morris F. de Castro, Governor of the Virgin

---

        [7]In his motion, D'Amour asserts that "[t]he Open Shorelines Act ("OSA"),
title exception number 13 listed on the title commitment, does not constitute
a servitude on the island that renders title defective.  As a matter of law
this Court must determine that the OSA is not a title defect." (D'Amour's Mem.
of Law in Supp. Of his Renew. Mot. for J. as a Matter of Law 6.) (internal
footnote omitted). D'Amour invites the Court to rule on the OSA's general
effect on the title of a piece of land; however, the issue presented in this
matter was whether the OSA title exception reflected a misrepresentation by
D'Amour of Buyers' ability to convey title under the terms of the contract.

Islands on behalf of the Municipality of St. Thomas and St. John,
recorded January 20, 1953, in Book 4-E, Page 404, Doc. No. 30 (as
to Lot Two)" cannot constitute an actionable misrepresentation
because it "did not encumber the Nazareth property in any form."
(D'Amour's Mem. of Law in Supp. of his Renew. Motion for J. as a
Matter of Law 6.)

The exceptions to title, though dismissed as insignificant
by D'Amour, did constitute exceptions that were not "licenses and
easements, if any, for public utilities serving only the Real
Property." (Contracts of Sale ¶ 6.)  The Buyers presented
evidence that D'Amour knew of these exceptions at the time of
contracting, yet promised that the Sellers could deliver title
wherein the only title exceptions were those for licenses and
easements for public utilities.  D'Amour thus fails to show that
a reasonable juror could not find him liable for misrepresenting
the Sellers' ability to convey clear and marketable title as that
term was defined under the Land Contracts.

### b. Waiver

D'Amour argues that irrespective of his representations
related to the Escrow Documents and the Buyers' alleged reliance,
the Buyers waived their right to assert a fraud claim against
him.  He highlights the Buyers' continued performance under the
contract after their receipt of the Escrow Documents as

illustrative of the Buyers' acceptance of the documents as
satisfactory.  D'Amour specifically notes that the permits
attached to the Escrow Documents listed their expiration dates,
and thus the Buyers should have been aware that the permits were
expired.  He asserts that the Buyers' continued performance under
the Contracts waived any right to bring a fraud claim.  Moreover,
he objects to this Court's rejection of a proposed jury
instruction on waiver at trial.

In order to be entitled to a jury instruction on a claim, a
party must present sufficient evidence to support such a claim.
*Dewyer v. Temple Univ.*, 89 Fed. Appx. 811, 813 (3d Cir.
2004)(unreported).  To establish waiver, D'Amour was required to
present evidence that the Buyers acted with "full knowledge of
[their] rights and of the material facts constituting the fraud."
*Citizens & Southern Secs. Corp.*, *v. Braten*, 733 F. Supp. 655, 665
(S.D.N.Y. 1990)(citations omitted).  D'Amour failed to
demonstrate that the Buyers, conscious of defects in the permits,
elected to move forward with the sale.  In the absence of such a
showing, the Court was not required to give a waiver instruction.

**4. Failure to Disclose Interest in First American Title**

**a. Existence of Duty**

D'Amour argues that as a matter of law he had no duty to

disclose his interest in First American Title. Perez testified at trial that he believed that the escrow agent involved in the Great St. James and Nazareth transaction was "one of the largest title companies in the United States." (Excerpt: Testimony of Jorge Perez at 14, Jun. 24, 2009.) D'Amour argues that "Plaintiffs' unexpressed confusion," of his sole proprietorship with a larger corporation, did not create a duty of disclosure. (D'Amour's Mem. of Law in Supp. of his Renew. Mot. for J. as a Matter of Law 17.)

However, even if the Buyers did not appropriately communicate their misunderstanding about the size of the company serving as the escrow agent, there were alternative grounds giving rise to D'Amour's duty to disclose his interest. At trial Perez testified that he expressed a desire to have an uninterested, third-party serve as the escrow agent. D'Amour's suggestion of First American Title in response to Perez's request, constituted an independent basis on which D'Amour may have been required to disclose his interest in First American Title. *See* RESTATEMENT (SECOND) OF TORTS § 551 (2)(1977)(listing that a party to a business transaction must disclose "matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading," as well as "facts basic to the transaction, if he knows that the other is

about to enter into it under a mistake as to them"). The Court
finds that there was evidence for a reasonable juror to believe
that D'Amour knew that the Buyers believed First American Title
was an independent company and failed to rectify that
misunderstanding.

### b. Imputation of Knowledge

D'Amour argues that there was no basis for a finding that he
committed fraud by failing to disclose an interest in the title
company used to manage the escrow account. At trial, Perez
testified that when he and D'Amour discussed using First American
Title, as an escrow agent: "[t]he words he used was he understood
we, the buyers, were interested in an independent third party.
And if--he said First American Title has an office in St. Thomas,
and if it would be okay if First American Title would act as
escrow agent." (Excerpt: Testimony of Jorge Perez Tr. at 9, June
24, 2009.) Perez further testified that on the date the parties
entered into the Escrow Agreement and Land Contracts, he was not
aware of any connection between D'Amour and First American Title.
A reasonable juror could find that D'Amour's failure to disclose
his interest in the escrow agency induced the parties' consent to
the Contracts of Sale, and more specifically to the use of First
American Title as the escrow agent.

D'Amour attempts to argue that his nondisclosure was

insignificant because the Buyer's counsel, attorney Henry Smock,

was aware of D'Amour's ownership interest in First American

Title. "[T]he attorney and client have an agency relationship

and therefore any facts known by the attorney may generally be

imputed to the client." *In re Kensington Int'l Ltd.*, 368 F.3d

289, 315 (3d Cir. 2004)(citing RESTATEMENT (SECOND) OF AGENCY § 9(3)

(1958)). D'Amour maintains that Smock's knowledge of D'Amour's

interest in First American Title should be so imputed to the

Buyers. However, Smock's testimony at trial revealed that he was

not involved with the negotiation and drafting of the Contracts

of Sale. He further testified that he was not involved in their

execution. The Sellers however argue that Smock was acting as

counsel to the Buyers' at the time the parties entered into the

Contracts and thus the Buyers had knowledge of D'Amour's interest

in First American Title through Smock.

> When an agent is aware of a fact at the time of taking
> authorized action on behalf of a principal and the fact
> is material to the agent's duties to the principal,
> notice of the fact is imputed to the principal although
> the agent learned the fact prior to the agent's
> relationship with the principal, whether through formal
> education, prior work, or otherwise.

RESTATEMENT (THIRD) AGENCY § 5.03 cmt. e (2006).

Smock testified as follows:

Q: At the time that Mr. Hayden contacted you and

> engaged you around early June of 2004, did you know
> that Mr. D'Amour was a principal of First American
> Title Company here in St. Thomas?
>
> A: I knew that he had a title company. I'm not sure
> exactly what the name was, but yes.
>
> Q: Well, at the time of your deposition I asked you if
> you knew that Mr. D'Amour was the principal of First
> American Title Company, and you said, "Correct."
>
> A: All right. That's still correct.

(Excerpt: Testimony of Hank Smock Trial Tr. at 24-25, June 23, 2009.) Assuming *arguendo* that Smock's knowledge should have been imputed to the Buyers, there were other bases on which a reasonable juror could have found D'Amour liable for fraud. As such, judgment as a matter of law in D'Amour's favor is not warranted on the fraud claim against him.

### c. Jury Instructions on the Duty to Disclose

When instructing the jury on the duty of a party to a business transaction to disclose information, the Court stated:

> One party to a business transaction is under a duty to
> exercise reasonable care to disclose to the other
> before the transaction is consummated: (1) matters
> known to him that the other is entitled to know because
> of a fiduciary or other similar relation of trust and
> confidence between them; (2) matters known to him that
> he knows to be necessary to prevent his partial or
> ambiguous statement of the facts from being misleading;
> (3) subsequently acquired information that he knows
> will make untrue or misleading a previous
> representation that when made was true or believed to
> be so; (4) the falsity of a representation not made
> with the expectation that it would be acted upon, if he
> subsequently learns that the other is about to act in

> reliance upon it in a transaction with him; and (5)
> facts basic to the transaction, if he knows that the
> other is about to enter into it under a mistake as to
> them, and that the other, because of the relationship
> between them, the customs of the trade or other
> objective circumstances, would reasonably expect a
> disclosure of those facts.

(Jury Charge at 20, June 29, 2009.)

D'Amour objects to the absence of two of his requested instructions as to the failure to disclose claim. The first instruction included language about the circumstances in which a duty to disclose does not exist in the context of a business transaction. The second instruction described the imputation of information known by an agent to a principal. These proposed instructions were fashioned from comments in the Restatement.

"A party is entitled to a jury instruction that accurately and fairly sets forth the current status of the law." *Douglas v. Owens*, 50 F.3d 1226, 1233 (3d Cir. 1995). However, a party is not guaranteed that instructions will be presented "precisely in the manner and words of its own preference." *Id.* When considering the parties' proposed jury instructions, the Court determined that the duty to disclose instruction provided in the jury charge offered the most clarity. D'Amour has failed to provide any authority that, without his proposed instructions, the jury was not informed of the essential elements of a

fraudulent failure to disclose claim.  As such, the Court finds

insufficient grounds for a new trial based on its rejection of

his proposed instructions.

**C.   D'Amour's Motion for Amended Judgment on the Fraudulent
Conversion Claim**

**1. Conversion of the Second Deposit**

Prior to trial, the Court partially granted a motion for

summary judgment against D'Amour.  The Court adjudged him liable

for fraudulently converting the Buyers' second deposit of

$500,000.  Under the Restatement, one who acts as a bailee,

agent, or servant may be subject to conversion liability if he

makes an unauthorized delivery of property, unless he delivers

the property to someone entitled to its immediate possession. *See*

Restatement (Second)of Torts § 223 (1965).  D'Amour claims that in

making its conversion ruling, the Court failed to consider a

necessary element of conversion— that the victim of the

conversion have had a clear, immediate right to the funds.  He

argues that because the Buyers breached their contract with the

Sellers, they forfeited their right to immediate possession of

the escrow funds.  In the absence of the Buyers possessing a

right to the escrow funds, D'Amour argues that the Buyers had no

viable claim that he committed conversion at that time.

However, the Court considered precisely this argument when

ruling on the motion for summary judgment on the conversion claim

and again when addressing D'Amour's motion for reconsideration of

that ruling. The Court explained:

> [T]he Court found that the following material facts
> were undisputed: the Buyers wired $1.5 million in
> escrow funds into the account of Premier, the escrow
> agent; the escrow agreement authorized Premier to
> release those funds after receiving written notice of
> satisfaction from the Buyers; Premier did not receive
> such a notice for at least $500,000 of those funds; and
> notwithstanding the absence of such a notice, Premier,
> through D'Amour, released all of the escrow funds to
> the Sellers. . . .
>
> D'Amour's liability rests on whether he personally
> acted in violation of the escrow agreement between the
> Buyers and Premier and personally released the Buyers'
> money without their permission. Because it is
> undisputed that D'Amour did violate that agreement and
> did not have permission to release the Buyers' money,
> at least with respect to the $500,000 installment, the
> Court entered judgment against him in that amount.

*Addie v. Kjaer*, 2009 WL 1140006, at *8 (D.V.I. Apr. 28,

2009). As the Court noted, the Buyers' right to possession

of funds pursuant to the Escrow Agreement was not dependent

on their performance under the Contracts between the Buyers

and Sellers. The Buyers retained an immediate right to

their escrow funds until Premier received written notice of

satisfaction from them. Consequently, D'Amour may not

shield himself from liability from conversion by invoking a

contract that did not bear on his obligations under the

Escrow Agreement.

D'Amour has failed to demonstrate a defect in the
Court's finding that the Buyers proved the necessary
element of their right to immediate possession of escrow
funds.  As such, no amendment of the Court's judgment is
needed.

**2. Renunciation of the Conversion Award by Addie
and Perez**

On August 13, 2009, the Buyers filed a "Notice of
Renunciation of Interest in Order and Regarding Claim of
Interest" in which they stated as follows:

> Addie and Perez renounce any interest they have in
> this Court's order dated February 23, 2009 . . .
> (the "Order") so that Taylor alone possesses all
> of the rights of the Buyers under the Order.
>
> Taylor renounces any claim to pre-judgment
> interest on the award set forth in the Order
> provided he recovers pre-judgment interest on the
> $1,500,000 of the $1,546,000 awarded by the
> jury[.]"

(Notice of Renunciation of Interest, August 13, 2009.)  In
light of that renunciation, the Court entered judgment for
Taylor alone.  D'Amour now questions the validity of Addie
and Perez' renunciation.

D'Amour notes his "grave concern about the life cycle
of this renunciation given Plaintiffs history of
disavowing prior agreements." (D'Amour's Mem. of Law in
Supp. of his Renew. Mot. for J. as a Matter of Law 19.)

He questions the Court's acceptance of Addie and Perez's renunciation without requiring that such renunciation be committed to a binding stipulation or affidavit. He further expresses concern that "[r]enunciation of a court award of damages has not been previously recognized under Virgin Islands law." (*Id.*)

The Court notes that in civil actions, plaintiffs maintain the right to move for dismissal of claims after filing a complaint. The Court further notes that Plaintiffs often seek dismissal of claims through a request by counsel. In light of this generally accepted practice, it reasonably follows that plaintiffs can decline to collect an award for a civil claim, after judgment has been entered in their favor, through their counsel. D'Amour has failed to establish that Perez and Addie need sign a stipulation[8] in order to effectuate a

---

[8]The Court notes that in support of his argument that Perez and Addie should have signed a stipulation or affidavit, D'Amour cites to *Granger v. Standard Fire Ins. Co.*, 2008 WL 1805769, * at 1 n. 2 (W.D. La. Apr. 16, 2008). There, the court discussed the need for a binding stipulation or affidavit in a renunciation of some damages when that renunciation implicated the amount in controversy requirement in the context of a determination of diversity jurisdiction. The *Granger* Court issued no sweeping statement that renunciations should be memorialized in a binding stipulation or affidavit. Rather, that court's discussion of binding stipulations was clearly linked to the circumstances under which a litigant can prevent the removal of a case from federal to state court. *See Granger*, 2008 WL 1805769, at *1 (W.D. La. Apr. 16, 2008)(quoting *DeAguilar v. Boeing Co.*, 47 F.3d 1404, 1412 (5th Cir. 1995))("'[l]itigants who want to prevent removal must file a binding stipulation or affidavit with their complaints.'" ).

valid renunciation.  The Court thus finds no error with its decision to countenance the "Notice of Renunciation of Interest in Order and Regarding Claim of Interest."

### IV. <u>CONCLUSION</u>

For the foregoing reasons, D'Amour's motions for judgment as a matter of law, amended judgment, and new trial are **DENIED.** An appropriate Order follows.

S\_____
        **CURTIS V. GÓMEZ**
         **Chief Judge**